Philip COPELAND, Petitioner,

v.

Hans G. WALKER, Superintendent, Auburn Correctional Facility, Respondent.

No. 97–CV–2082 (ERK).

United States District Court, E.D. New York.

April 15, 2003.

Phillip Copeland, 89–A–5229, Great Meadow Prison, Comstock, NY, for petitioner.

John M. Castellano, District Attorney, Queens County, Kathleen P. O'Leary, Kew Gardens, NY, for respondent.

### CORRECTED MEMORANDUM & ORDER

KORMAN, Chief Judge.

In the early morning hours of February 26, 1988, a young and newly appointed New York City Police Officer, Edward Byrne, sitting in his patrol car outside the

home of a witness he was assigned to protect, was shot five times in the head from a distance of two feet. Officer Byrne died instantly. The killing was apparently meant to send a message to law enforcement authorities from Howard "Pappy" Mason, one of two Queens drug lords who were incarcerated at the time. Petitioner, Philip Copeland, was convicted by a jury sitting in New York State Supreme Court of carrying out this crime along with his co-defendants Todd Scott, David McClary, and Scott Cobb. Howard "Pappy" Mason was convicted here for his role in the offense. *See United States v. Nichols,* 56 F.3d 403 (2d Cir.1995).

The testimony adduced at trial established that Officer Byrne's execution-style murder was planned by petitioner and his co-conspirators on February 25, 1988, in the home of Roger Philips, defendant Todd Scott's uncle. Two witnesses to that meeting testified that Todd Scott informed Cobb and Copeland that "the boss" had put out an order to kill a cop, for which the participants would earn $8,000. Cobb and Copeland nodded in response. Scott relayed this information from David McClary, who received the actual order from Pappy Mason. Petitioner stated that Mason was "pissed off" and wanted to see on television that a cop got "iced." Petitioner, Scott and Cobb drew straws to determine who would perform the actual shooting, after which petitioner indicated that Cobb was to get the guns from another gang member and also provide the car.

Rachel Moore, an eyewitness to the shooting, testified that she saw petitioner and defendants McClary and Scott in an old yellow car. She was familiar with petitioner for several years and was also able to identify the car she saw as a 1979 Dodge Diplomat with Alabama license plates that was recovered by police. Petitioner's fingerprints were recovered from a piece of paper inside the car used by the

killers. Moore, who was standing approximately three houses from Officer Byrne's patrol car at the time of the murder, clearly identified the same yellow car which Scott Cobb was driving. According to Moore, Scott got out of the car and approached the passenger side of the patrol car, while McClary and petitioner walked up to the driver's side. The three men reached into their pockets, pointed guns at the officer and started shooting.

Another eyewitness to the shooting was a man named Arjune, the witness Officer Byrne was assigned to protect. He testified that at approximately 3:30 a.m. on February 26, 1988, he was awakened by five gunshots coming from the front of his house. Arjune looked out the window and saw a "beat up" car, with the right rear hubcap missing, moving slowly down the block with Scott Cobb driving. He also noticed Todd Scott near the driver's side of the patrol car, another black male standing in the street, and a fourth person getting inside the car with Cobb. Scott had something in his hand, which he stuffed into his jacket pocket. All of the men jumped in the car and drove away.

In his defense, petitioner asserted that he spent the night of Officer Byrne's murder at the Kennedy Hotel with a woman named Audette Wills. Wills testified that she was picked up by petitioner and checked into the hotel at around 10:30 p.m. on February 25. They went to the Flagship Diner to place a takeout order and then returned to the hotel room at approximately 1:00 a.m. Wills testified that she was with petitioner the entire night and only fell asleep from 4:00 a.m. until approximately 7:00 a.m. the following morning. In a previous statement to the police, however, Wills testified that she had fallen asleep at 2:00 a.m., leaving petitioner ample time to reach the crime scene (only 1

mile from the hotel) before Officer Byrne's shooting at 3:30 a.m.

Petitioner was convicted on May 16, 1989, of Murder in the Second Degree (N.Y. Penal Law 125.25[1]) and Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law 265.03). He was sentenced to twenty-five years to life imprisonment on the murder count and five to fifteen years' imprisonment on the weapon count. On appeal, petitioner raised four claims. He argued that (1) the evidence was insufficient to prove beyond a reasonable doubt that he had killed Officer Byrne; (2) the trial judge improperly forced petitioner to remain in the courtroom during portions of the trial; (3) the trial court incorrectly determined that he had failed to make out a *prima facie* case of discrimination on the part of the prosecutor during voir dire; and (4) the prosecutor deprived petitioner of a fair trial by making inflammatory arguments in both his opening and closing statements.

In his Appellate Division brief, petitioner also adopted the claims of his co-defendants, Todd Scott and David McClary. Additional issues raised through these co-defendants include allegations that (1) the conduct of defense counsel for Scott Cobb and Todd Scott biased the trial judge against petitioner; (2) the trial court improperly marshaled the evidence in its charge to the jury; (3) the trial judge failed to excuse several prospective jurors for cause; and (4) the trial judge made disparaging remarks to the defense attorneys in the presence of the jury. Petitioner subsequently filed a *pro se* supplemental brief to the Appellate Division raising several additional claims. He argued (1) that the trial judge's evidentiary rulings, particularly the exclusion of expert testimony on the long term effects of crack use on a person's ability to recall, had deprived him of a fair trial; (2) that he was denied his right to be tried only upon the indict-

ment of the Grand Jury; (3) that the trial court had erred by permitting the prosecution to elicit evidence of petitioner's involvement in certain uncharged crimes for the purpose of establishing motive for the killing of Officer Byrne; and (4) that the prosecutor failed to disclose in a timely manner information regarding several prosecution witnesses, in violation of New York Criminal Procedure Law Section 240.45 and *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).

The judgment of conviction was unanimously affirmed. *People v. Copeland*, 197 A.D.2d 629, 602 N.Y.S.2d 683 (2d Dep't. 1993). The Appellate Division held that the prosecutor had not impermissibly used race as a criterion in jury selection, and that the evidence adduced at trial was legally sufficient to establish petitioner's guilt beyond a reasonable doubt. The Appellate Division specifically found that the testimony presented by several of defendant's alibi witnesses were not improperly discredited by the trier of fact. It also found that petitioner's remaining contentions, including those raised in his *pro se* supplemental brief, were either unpreserved for appellate review or without merit.

Petitioner sought leave to appeal his conviction to the New York Court of Appeals. The leave letter, written by petitioner's attorney, read as follows:

Pursuant to section 460.20 of the Criminal Procedure Law, the above named Defendant–Appellant requests permission to appeal to the Court of Appeals from an order of the Appellate Division, Second Department, which affirmed his conviction

To facilitate review on appeal, the litigants' briefs and the court's order are enclosed herein.

Once a Judge has been assigned to this application, please send me his name. Thank you.

(Letter from Steven Feldman to Donald Sheraw, dated October 25, 1993). No additional correspondence was sent by petitioner to the Court of Appeals. Judge George Bundy Smith denied petitioner's leave application, *see People v. Copeland,* 82 N.Y.2d 848, 606 N.Y.S.2d 600, 627 N.E.2d 522 (1993), and petitioner did not seek a writ of certiorari from the United States Supreme Court.

More than three years later, in an affidavit dated March 19, 1997, petitioner moved in the Appellate Division, Second Department, for copies of the hearing and trial transcripts in his case, to file a motion for a writ of *coram nobis. See People v. Bachert,* 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987). Petitioner's motion was denied on April 24, 1997. No *coram nobis* petition was ever filed. On or about April 22, 1997, petitioner filed this petition for a writ of habeas corpus. The petition raises four claims: (1) that the proof at trial was legally insufficient to support his conviction; (2) that the prosecutor's inflammatory arguments in his opening and closing statements deprived petitioner of a fair trial; (3) that the prosecutor discriminated against African-Americans in jury selection; and (4) that the trial court improperly forced him to remain in the courtroom during portions of the trial. Petitioner also adopted the arguments presented by his co-defendants Todd Scott and David McClary in their respective Appellate Division briefs.

Respondent moved to dismiss the petition as time-barred pursuant to 28 U.S.C. § 2244(d)(1) and *Peterson v. Demskie,* 107 F.3d 92 (2d Cir.1997). Judge Raggi dismissed the petition on this ground on March 24, 1998. The Court of Appeals for the Second Circuit subsequently granted a certificate of appealability, vacated the dismissal in light of the decision in *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), and remanded for a determination whether the petition was timely filed on or before April 24, 1997. *See Copeland v. Walker,* No. 98-2405 (2d Cir. Nov. 16, 1999). Prior to the Court of Appeals' decision, Judge Raggi granted petitioner's motion for reconsideration. The petition was held to have been timely filed and the respondent was directed to file a return. *See Copeland v. Walker,* No. 97-CV-2082 (RR) (July 29, 1999).

While I conclude ultimately that petitioner's application for leave to appeal to the New York Court of Appeals was insufficient to preserve for habeas corpus review any of the issues raised in the assorted briefs that petitioner filed there, I first address the merits of each of those claims.

## DISCUSSION

### I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, *habeas* relief may not be granted with respect to a claim that was adjudicated on the merits in state court proceedings unless the adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1994). Moreover, a state court determination of a factual issue is presumed to be correct, id. § 2254(e)(1), and is unreasonable only where the petitioner meets the burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.*

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court interpreted § 2254(d)(1) as giving independent meanings to the "contrary to" and "unreasonable application" clauses. *Id.* at 404, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495. A state court decision involves an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id; accord Overton v. Newton*, 295 F.3d 270, 275 (2d Cir.2002).

In examining the state court's application of federal law, the appropriate inquiry is whether the decision was objectively reasonable, not whether it was incorrect or erroneous. *Williams*, 529 U.S. at 410, 120 S.Ct. 1495. However, while "[s]ome increment of incorrectness beyond error is required[,] . . . [that] increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)(internal citations omitted). Under this analysis, the state court's determination of factual issues are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1).

Finally, it is the obligation of the petitioner to have developed the factual record sufficiently to support his claim. 28 U.S.C. § 2254(e)(2) provides in pertinent part:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

## II. LEGAL SUFFICIENCY OF THE EVIDENCE ADDUCED AT TRIAL

Petitioner contends that the evidence presented at trial was legally insufficient to sustain his conviction. The Supreme Court has held that a state criminal conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the AEDPA, a writ of habeas corpus may be issued for evidentiary insufficiency only if the state court unreasonably applied the *Jackson* standard. In other words, the habeas court does not conduct its own *Jackson* review *de novo*, but merely analyzes "whether the state court provided fair process and engaged in reasoned, good-faith decision-making when applying *Jackson's* 'no rational trier of fact' test." *Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir.), *vacated and remanded*

*on other grounds,* 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997); *see also Redd v. Quinones,* 1998 WL 702334, *4–5 (S.D.N.Y. Oct.7, 1998) ("Under the [AEDPA], this Court may not grant the instant [habeas] petition unless we find that the state court unreasonably applied the principles underlying the *Jackson* standard when reviewing petitioner's claim."); *Fernandez v. Dufrain,* 11 F.Supp.2d 407, 417–18 (S.D.N.Y.1998); *Mobley v. Stinson,* 1997 WL 80587, *2 (S.D.N.Y. Feb.26, 1997). The Appellate Division reasonably and carefully applied the *Jackson* standard when determining that the trial evidence was sufficient to sustain petitioner's conviction by relying on *People v. Contes,* 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932 (1983), which incorporates the *Jackson* standard. Applying this correct standard of review, the Appellate Division reasonably concluded that the evidence at trial, viewed in the light most favorable to the prosecution, was sufficient to sustain a conviction beyond a reasonable doubt. *See People v. Copeland,* 197 A.D.2d 629, 602 N.Y.S.2d 683 (1993).

■ In any event, petitioner's claim fails under the traditional analysis as well since the record does not support a finding that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. A federal habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of a state criminal conviction. *Einaugler v. Supreme Court of the State of New York,* 109 F.3d 836, 840 (2d Cir.1997). All inferences from the evidence must be drawn in favor of the prosecution and the jury's assessment of the credibility of witnesses may not be second-guessed. *See Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994). Thus, under this "rigorous standard" a " 'federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact

resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir.1994) (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781).

■ Petitioner and his co-defendants were jointly charged under New York law with Murder in the Second Degree, on a theory of intentional murder. New York law provides that a person is guilty of intentional murder in the Second Degree when, "[w]ith the intent to cause the death of another person, he causes the death of such person." New York Penal Law § 125.25(1). New York law further provides that an individual may be held criminally liable as an accomplice to an offense committed by another when, "acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." New York Penal Law § 20.00. Intent may be proven by circumstantial evidence including the defendant's conduct and the surrounding circumstances of the crime. *See People v. Steinberg,* 79 N.Y.2d 673, 682, 584 N.Y.S.2d 770, 595 N.E.2d 845 (1992); *People v. Woodbourne,* 237 A.D.2d 547, 656 N.Y.S.2d 891 (2d Dep't.1997).

Considered in the light most favorable to the prosecution, both the direct and circumstantial evidence presented at trial was sufficient for a rational jury to conclude that petitioner, acting in concert with Todd Scott, David McClary, and Scott Cobb, intentionally killed Officer Byrne. The most compelling evidence against petitioner was provided by Rachel Moore, who testified that at around 3:30 a.m. on February 26, 1988, she saw petitioner (who she had known for several years), along with co-defendants Scott, and McClary, approach Officer Byrne's patrol car on 107th Avenue near Inwood Street in Queens County (T. 985, 1164, 1167, 1283). Moore,

who stood just three houses away from where the patrol car was parked (T. 1164), observed that all three defendants had guns in their hands (T. 1212–13). According to Moore, Todd Scott walked over to the passenger side of the patrol car, while petitioner stood behind David McClary, who positioned himself near the glass window on the driver's side of the car (T. 1164, 1169, 1208–09, 1217, 1240, 1307, 1313, 1341). Moments later, Moore heard gun shots and crawled under a parked car (T. 1164, 1213, 1342). Moore also testified that she had seen Scott Cobb driving a yellow car down 107th Avenue just moments before the shooting. Moore observed Cobb furtively stick his head out of the car and look backwards and then forwards (T. 1164).

Rachel Moore's recollection of the crime was corroborated by the testimony of Mr. Arjune, the witness Officer Byrne was protecting at the time of the attack (T. 137). Mr. Arjune saw four African–American males, two of whom he was able to identify as Scott Cobb and Todd Scott, leave the crime scene just after five shots were fired (T. 1832). Arjune testified that he was awakened by gunfire from in front of his house. Through his bedroom window, he observed Scott Cobb drive a beat-up car with the right hubcap missing—the same car identified by Moore (T. 1833–34, 1164). The car moved slowly from behind the patrol car that was parked outside Arjune's house (T. 1833–35, 1858). Arjune identified Todd Scott, who was standing right by the driver's side of the patrol car and who pushed his head into the window of the patrol car to look inside (T. 1834, 1850–51). After peering into the patrol car for about seven seconds, Scott got into the passenger side of the vehicle driven by Scott Cobb (T. 1836, 1857–58). The light inside the car was on and Arjune saw another black man sitting in the back seat (T. 1860). Arjune also saw a fourth person in the middle of the intersection of 107th

Avenue and Inwood Street, who hustled into the car driven by Cobb before Scott entered it (T. 1864). After all four men were aboard, the car turned onto Inwood Street and drove off (T.1987–88).

Petitioner's role in the planning of this execution-style murder was firmly established through the testimony of Darrell Newby and Martin Howell, who were both members of the drug gang known as the "Beebos," to which petitioner also belonged (T. 362–63, 527–28, 746, 754). Howell and Newby testified that on February 25, 1988, the night before Officer Byrne was killed, they attended a meeting in an apartment along with petitioner, Todd Scott, and Scott Cobb (T. 369, 370–71, 379). Prior to petitioner's arrival, Howell heard Scott announce that "the boss had put out an order to hit a cop" (T. 532, 589–90, 591, 593). Scott assured that anyone who participated would receive $8,000 in return and would not get caught because "the guy sleeps on the job and it would be easy" (T. 532, 593). Upon petitioner's arrival at the apartment, Newby (petitioner's cousin), overheard Todd Scott tell petitioner and Cobb "that we have to kill a police officer regarding a witness" (T. 372, 481–82). Newby then observed both petitioner and Cobb nod their heads "[u]p and down" in response to Scott's remark (T. 374, 460, 464). Howell also overheard petitioner ask Scott if he had the "jammies," or guns (T. 602, 664, 717, 727). Scott replied that he was going to get the "artillery" from "Ninja" (T. 603). Howell then heard petitioner say to Cobb, "We're going to use your car" (T. 537, 603).

Petitioner's complicity in the conspiracy to murder Officer Byrne is further evidenced by statements made both before the planning session and after the killing. Howell testified that earlier on February 25, petitioner declared to him that "the

Boss [Pappy Mason] was very pissed off and he wanted to see it on TV while he was on Riker's Island that a cop got iced" (T. 763–64, 770). In addition, the morning following the shooting Scott Cobb confessed to Newby that "We killed the cop" (T. 508, 521). That same day, Cobb told Howell, in petitioner's presence, how two cars had been used in the "hit"—one car was "dumped" while the other was used to take the participants to a party in Manhattan after the killing (T. 576, 740–41). Howell also heard petitioner tell Cobb that he did not want to hear anymore about "the situation" (T. 577, 665, 743). On the Monday following the crime, Newby also overheard Scott Cobb confess to a third person that he had pulled up behind the police officer's car and shot him (T. 508–09). Finally, on the Saturday following the shooting when some money was missing from the profits of drug sales, petitioner warned Howell and others that "if you all want to end up like that MF-ing cop, then that money better turn up" (T. 764–65).

In addition to this testimonial evidence, the prosecution also presented physical evidence linking petitioner to the crime. Specifically, petitioner's fingerprint was found on an Econo–Lodge scratch pad, which was recovered from the yellow car used by the perpetrators (T. 942, 1490, 1732). Based on this evidence, a rational juror could certainly conclude that petitioner was guilty of intentional murder.

▉ Petitioner argues that the prosecution's case was undermined by the testimony of his three alibi witnesses. However, two of these witnesses were not true alibi witnesses as they could not account for petitioner's whereabouts at the time of Officer Byrne's death (T.2030, 2033, 2035, 2065, 2071). The final alibi witness was petitioner's girlfriend, Audette Wills (T.2075). A jury is clearly entitled to reject uncorroborated testimony from such an interested witness. In addition, Ms.

Wills' testimony was inconsistent with earlier statements she gave the police. Although she testified at trial that she was with petitioner at a hotel the night of the shooting and had only been asleep from 4:00 a.m. to 6:45 a.m., Ms. Wills stated in her original police interview with Detective David Dallanegra that she was asleep between the hours of 2:00 a.m. and 7:00 a.m., making it impossible for her to verify petitioner's whereabouts at the time of the murder (T. 3475).

▉ Finally, petitioner attacks the credibility of the prosecution's witnesses, most notably Rachel Moore, Darryl Newby and Martin Howell. This argument is unavailing. Even on direct appeal, credibility determinations are exclusively the domain of the trier of fact. *See Hoffa v. United States*, 385 U.S. 293, 311–12, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("The established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury."); *United States v. Weinstein*, 452 F.2d 704, 713–14 (2d Cir.1971) ("when testimony is once before the jury, the weight and credibility of every portion of it is for them, and not for the Court to determine") (citations omitted). They cannot be revisited by federal courts in a habeas corpus proceeding. *See Marshall v. Lonberger*, 459 U.S. 422, 432–36, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

In sum, I cannot conclude that the Appellate Division unreasonably applied the *Jackson* standard, nor was the evidence insufficient for a rational jury to convict petitioner of murder in the second degree. Accordingly, the petition for a writ of ha-

beas corpus on this ground must be denied.

### III. THE PROSECUTOR'S USE OF PEREMPTORY CHALLENGES TO EXCLUDE AFRICAN–AMERICANS FROM THE JURY VENIRE

 Petitioner contests the use of peremptory challenges by the prosecutor. While the racially discriminatory use of peremptory challenges does violate the Equal Protection Clause right of an excluded juror, it does not violate the rights of petitioner. *See Allen v. Hardy*, 478 U.S. 255, 259, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) ("Our holding [in *Batson* ] ensures that states do not discriminate against citizens who are summoned to sit in judgment against a member of their own race and strengthens public confidence in the administration of justice."). By the time a case reaches its appellate stage, it is *too late to rectify the injury to the challenged jurors*. Moreover, in a state like New York where there is no suggestion of hostility to *Batson* or reluctance to enforce it, *see Rice v. Kuhlmann*, 212 F.Supp.2d 47, 51 (E.D.N.Y.2002), its arguable whether an occasional unremedied error should be subject to habeas corpus review. *Id.* Indeed, Judge Newman has argued persuasively that, even on direct appeal, "in those rare cases where the corrective action required to be taken by *Batson* during jury selection is not taken, the incremental benefit of enforcing *Batson* by reversing convictions obtained with fairly representative juries was not warranted." *United States v. Alvarado*, 923 F.2d 253, 254 (2d Cir.1991)(internal citation omitted); *see also Rice v. Kuhlmann*, 212 F.Supp.2d at 51. Nevertheless, the Second Circuit has held, over the dissent of Chief Judge Walker, that this claim may be asserted as a basis for habeas corpus relief. *See Galarza v. Keane*, 252 F.3d 630, 644 (2d Cir.2001) (Walker, C. J., dissenting).

### A. Clearly Established Law: Batson v. Kentucky

 The clearly established Supreme Court precedent applicable in this case is *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1985), in which the Court set forth a three-part test that trial courts are to employ in evaluating allegations of race-based exercise of peremptory challenges. Under *Batson*, a trial court must first determine whether the party challenging the peremptory strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. *See Hernandez v. New York*, 500 U.S. 352, 356, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir.2000). Such a *prima facie* case may be established by showing a pattern of challenges against minority prospective jurors. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Once a *prima facie* case is established, the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror. *Id.; Hernandez*, 500 U.S. at 358–59, 111 S.Ct. 1859. This explanation need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

 Finally, the court must evaluate whether the moving party has carried his burden of proving that the strike was motivated by purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712. This analysis "largely will turn on evaluation of the credibility" and the demeanor of the attorney offering the race-neutral explanation for the strike. *Id.* 500 U.S. at 365, 111 S.Ct. 1859 (quoting *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712). Since "[t]he credibility of an attorney offering a race-neutral explanation is at the very heart of [the] analysis," *Barnes v. Anderson*, 202 F.3d 150, 157 (2d Cir.

1999), the reviewing court "ordinarily should give [the trial court's] findings great deference." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712; *see also Hernandez,* 500 U.S. at 364, 111 S.Ct. 1859.

## B. Standard of Review

■■■ As articulated by the Second Circuit, " 'the threshold decision concerning the existence of a prima facie case of discriminatory use of peremptory challenges involves both issues of fact and an issue of law.' " *Overton,* 295 F.3d at 276 (quoting *United States v. Alvarado,* 891 F.2d 439, 443 (2d Cir.1989), *vacated on other grounds,* 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990) ("*Alvarado I* ")). Once the fact-finding has been performed, "the judge must then determine, as a matter of law, whether these underlying facts suffice to establish a *prima facie* case." *Alvarado I,* 891 F.2d at 443. On habeas review, such mixed questions of law and fact translate to "mixed constitutional questions (i.e., application of constitutional law to fact)." *Williams v. Taylor,* 529 U.S. 362, 400, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring). "Under the AEDPA, they are subject to the standard set forth in 28 U.S.C. § 2254(d)(1), which requires the habeas court to determine whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' " *Overton,* 295 F.3d at 277 (quoting 28 U.S.C. § 2254(d)(1)). Because the trial judge in this case determined that the petitioner had not made out a *prima facie* case, he did not reach the second and third steps of the *Batson* analysis. Thus, my inquiry is limited to whether the trial judge's threshold determination was contrary to or an unreasonable application of Supreme Court precedent.

## C. The Merits of Petitioner's Batson Challenge

The voir dire in this case proceeded in multiple rounds, each of which involved a separate panel of prospective jurors. The record made by the trial judge at the end of each round of the voir dire provides some information on the exercise of challenges against blacks by the prosecution and petitioner. Nevertheless, in some rounds, the record does not reflect the racial background of each individual excused juror. On the first panel, the prosecution challenged one black and the defendant challenged one black (V.670). On the second panel, the prosecution again challenged one black and the defendant challenged one black (V.738). On the third panel, the prosecution challenged two blacks and the defense challenged two blacks (one peremptory; one challenge for cause) (V.1276–80). On the fourth panel, the prosecution challenged three blacks, prompting defense counsel to note this for the record, but accepted one juror who by appearance looked black (V.1387–89). On the fifth panel, the prosecutor challenged two blacks but accepted one black juror (V.1497–98). On the sixth and final panel of jury selection, after the prosecutor had challenged an additional black juror, the defense counsel raised a *Batson* challenge, requesting that the prosecution be ordered to provide race-neutral reasons for the strikes. The trial judge denied this request, finding that there was no evidence of racial discrimination in the prosecutor's exercise of peremptory challenges (V.2272–73). After the prosecution challenged another black juror during the selection for alternates, the defense renewed its *Batson* challenge. Once again, the trial judge denied petitioner's request, stating that, "there is no systematic exclusion of black jurors by the D.A. because of race." (V.2280–81). Subsequently, after the trial judge indicated that there were no more

prospective jurors available to seat a full complement of alternates, the prosecution agreed to rescind its earlier peremptory challenge against the black juror who had been challenged in the sixth round. Both parties accepted her as the fourth alternate, resulting in a total of two black alternates (V.2282–83).

On direct appeal, the Appellate Division ruled that "during the jury selection process, the defendants failed to articulate and develop all the grounds, both factual and legal, supporting their claim. Their perfunctory statement that 10 excluded prospective jurors were black did not establish the existence of facts and other relevant circumstances sufficient to raise an inference that the prosecutor had used his peremptory challenges to exclude individuals because of their race." *People v. Copeland*, 197 A.D.2d 629, 630, 602 N.Y.S.2d 683 (2d Dep't.1993).

■■■■■ There is an insufficient basis for concluding that this decision was "contrary to" clearly established Supreme Court precedent. Both the trial judge and the Appellate Division correctly identified the correct governing law with respect to petitioner's *Batson* claim, and did not, on a question of law, reach a conclusion opposite to that of the Supreme Court. Nor was their determination an unreasonable application of Supreme Court precedent. While statistics alone may be sufficient to establish a *prima facie* case of discrimination in "appropriate circumstances," petitioner bears "the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court." *Overton*, 295 F.3d at 278–280. This was simply not done in the instant case. While it is possible to piece together information through inference and careful review of the voir dire transcript, petitioner did no more than cite the number of challenges against blacks. As in *Overton*, petitioner did not address

or call to the attention of the trial judge crucial information surrounding the statistics, such as the total racial makeup of the venire, the number of minorities who actually sat on the jury, and the number of minorities who were not challenged by the prosecutor. *See United States v. Williamson*, 53 F.3d 1500 (10th Cir.1995) (presence of minorities on jury as finally sworn was relevant to *prima facie* case determination); *Deputy v. Taylor*, 19 F.3d 1485, 1492–93 (3d Cir.1994) (number of minorities in the venire as a whole was relevant to *prima facie* case). Nor did petitioner argue that the prosecutor had no reason for any of the peremptory challenges other than race.

My review of the record here indicates that the prosecutor had twenty challenges available to him and an additional two challenges with respect to the selection of alternates. Of these twenty challenges, he used a total of nineteen, ten of which were used to exclude black jurors from the venire from which the twelve jurors were empaneled. Subsequently, as noted above, he withdrew his objection to one of those jurors and agreed to her sitting as an alternate. The issue of whether the relevant ratio should be ten of nineteen or ten of twenty is a close one on the record here. Ordinarily, the appropriate ratio would be based on the actual number of peremptories exercised. On the other hand, if the prosecutor waived peremptory challenges that could have been used to challenge prospective black jurors, it would arguably not be unreasonable to view such non-exercised challenges in determining the appropriate ratio. Even on this undeveloped record, it appears that the prosecution had opportunities to excuse black venire members on all of the first three panels but declined to do so (these jurors were either challenged by the defense or seated) (V.670, 738, 1486). In addition, the petitioner did not specify a particular ratio

of challenges in his Appellate Division brief—he merely stated that the prosecutor had used ten peremptories against blacks. (Def.App. Br. at 51). Consistent with the manner in which it was argued by petitioner, the Appellate Division did not articulate what ratio had been considered in deciding the case. *Copeland,* 197 A.D.2d at 630, 602 N.Y.S.2d 683. In any event, the difference between nine of eighteen and nine of twenty is not significant.

In the absence of any supporting evidence to give meaning to the statistics, the mere fact that the prosecutor used ten of twenty peremptories to excuse black jurors from the venire of which the twelve jurors were chosen is not sufficient to establish an inference of discrimination. *See Overton,* 295 F.3d at 279–80 (because petitioner failed to fully develop the facts before the trial judge, "[w]e cannot say, on this record, that the trial judge's refusal to implement *Batson's* process for testing each questioned challenge midway in the process was an unreasonable application of the *Batson* requirements"). Indeed, because petitioner failed to develop the record in support of his claim, the *Overton* Court determined that no prima facie case was established even though the prosecution used 70% of its challenges (7 of 10) against blacks. *Id.*

The Second Circuit's decision in *United States v. Alvarado,* 923 F.2d 253 (2d Cir. 1991) ("*Alvarado II* "), is not to the contrary. In *Alvarado II,* the court held that a *prima facie* case of discrimination was established by the petitioner's claim that the prosecution had employed more than 50% of its challenges towards excluding minorities from the jury (50% in the selection of the sitting jurors and 57% in the selection of the sitting jurors and alternates). *Id.* at 255–56. Writing for the majority in *Alvarado II,* Judge Newman explicitly noted that the significance of pure statistical inferences depends on having a fully developed record to make sense of the statistics: "Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities." *Id.* at 255.

Judge Newman also held that "[o]nly a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Id.* As in *Alvarado II,* the record in this case does not reflect the percentage of minorities on the venire itself (though it is possible here to glean at least some relevant information from the voir dire transcript). As a proxy for this factual element, *Alvarado II* substituted the less accurate measure of the total minority population of the Eastern District of New York, from which the venire was drawn. Comparing this figure (29%) with the statistical rate of the prosecution's peremptory challenges against minority jurors (57%), the court found that "a challenge rate **nearly twice the likely minority percentage of the venire** strongly supports a prima facie case under Batson." *Id.* at 256.

Using the minority population of the county from which the jury was drawn as a proxy for the actual percentage of minorities on the jury venire is not an appropriate measure in a habeas corpus proceeding. First, when dealing with such a small system of numbers, the statistical significance of even a single change can be substantial. Thus, if the venire included even a few more minority jurors than the demographics of Queens County might predict, it could alter the statistical significance of the percentages. Indeed, in this case, although the African–American popu-

lation in Queens County at the time petitioner's jury was drawn was approximately 22% (*see* Bureau of the Census, *Census of Population and Housing,* 1990 Summary Tape File 1), this statistic is not an accurate reflection of petitioner's actual jury venire. While the total number of blacks in the venire is not clear from the record, a careful examination of the transcript reveals that, *at the very least,* 16 of the 56 prospective jurors were black—or, 29% of the venire.

Moreover, second-guessing a trial judge's decision based on the actual makeup of the jury venire by substituting artificial and possibly inaccurate statistics is contrary to the very nature of habeas review, a system that is supposed to be limited in scope and highly deferential to state court decisions. In addition, statistical comparisons of peremptory strike patterns are relevant only to the extent that they suggest an inference of discriminatory intent. For this reason, at least one court has explicitly held that "only the racial composition of the universe in which the prosecutor was operating is relevant." *United States v. Esparsen,* 930 F.2d 1461, 1467–68 & n. 5 (10th Cir.1991) (statistics of race of jurors struck by prosecutor are not enough to establish prima facie case and "take[ ] on meaning only in the context of other information such as the racial composition of the venire, the race of others struck by the prosecution, or the voir dire answers of those who were struck compared to the answers of those who were not struck"). Finally, the employment of this proxy is inconsistent with 28 U.S.C. § 2254(e)(2), which requires the petitioner to fully develop the record in the state court proceedings.

In any event, the Second Circuit's finding in *Alvarado II* does not bind my decision here. *Alvarado II* was a direct appeal from a conviction in the Eastern District of New York. However, the standard of review on a habeas petition is far more deferential with respect to mixed questions of law and fact than an appellate court on direct review. A state court's decision may be overturned only if the court "unreasonably" applied Supreme Court precedent. Even if the Second Circuit may have found a *Batson* violation on these facts on direct appeal, there is considerable disagreement among the circuits concerning this issue. Many federal appellate courts have determined that facts similar to this case do not raise a *prima facie* inference of discrimination under *Batson. See e.g., Jefferson v. United States,* 631 A.2d 13 (D.C.App. 1993) (Prosecutor's use of nine of ten peremptory strikes to remove black prospective jurors from venire did not make *prima facie* showing of race discrimination in violation of *Batson,* absent evidence of percentage of blacks actually called forward to be accepted or challenged); *Brewer v. Marshall,* 119 F.3d 993 (1st Cir.1997) (in the absence of any additional evidence supporting an inference of discrimination, the prosecutor's use of four of nine challenges to exclude four of six black jurors did not constitute a *prima facie* case for discrimination); *United States v. Malindez,* 962 F.2d 332, 333 n. 2 (4th Cir.1992) ("The fact that 50 percent (four out of eight) of the Government's peremptory challenges were exercised against black veniremen, standing alone, is insufficient to establish a *prima facie* case of purposeful discrimination."); *United States v. Temple,* 890 F.2d 1043, 1045–46 (8th Cir.1989) ("Without more, [petitioner's] reliance on the fact that the government used two of its seven peremptory challenges to exclude two of the four potential black jurors is insufficient to establish the requisite *prima facie* showing under *Batson.*"). Indeed, several courts have held that statistics alone are never sufficient to raise a *prima facie* in-

ference of discrimination. *United States v. Dawn*, 897 F.2d 1444, 1448 (8th Cir. 1990) (evidence that prosecutor used six of seven peremptory challenges to exclude black venire members from jury was insufficient to establish *prima facie* case of purposeful discrimination because "numbers alone are not sufficient to establish or negate a prima facie case."); *United States v. Grandison*, 885 F.2d 143, 148 (4th Cir.1989) (noting that "statistical comparisons are ... a poor way to resolve a *Batson* challenge" and holding that evidence of prosecutor's use of six out of nine peremptory challenges against minorities did not constitute a *prima facie* case).

Moreover, although the record here was not developed by the petitioner during the state court proceedings, the facts that are reflected in the record support the trial judge's determination. Although it is not possible to ascertain with certainty the racial background of all of the individual jurors due to the petitioner's lack of diligence, the voir dire questioning suggests race-neutral reasons for many of the prosecution's peremptory challenges. *See United States v. Ferguson*, 23 F.3d 135, 141 (6th Cir.1994) (possible explanations for challenges may be taken into account in ruling on existence of a *prima facie* case). For instance, many of the jurors in question lived in and around the area where the crime was planned and committed (V.262, 1049–51, 1055, 1071, 1100, 1339, 1430, 1436, 1458). Except for a few jurors

with positive law-enforcement sentiments, the prosecution systematically eliminated all jurors with a connection to the area (V.83, 263, 342–44, 635–36, 996, 1049, 1055, 1071, 1096, 1100, 1161, 1259, 1436). Nearly all of eliminated jurors that can be verified as black lived in or near the area of the crime: Mannyofe[1] (V.263); Moore (V.996, 1055); Leach[2] (V.1049); Middlebrooks (V.1071); Chesson (V.1096); Sullivan (V.1339); Blair (V.1436); Raymond (V.1458). These jurors lived in the same neighborhood as the drug organization that orchestrated Officer Byrne's murder and could reasonably have feared reprisal, especially since petitioner's homicide was itself retaliatory in nature. Indeed, at least two of the prospective jurors explicitly voiced their concerns over safety and possible reprisal (V.342, 635, 1276–78).

The record also suggests other plausible, race-neutral reasons for the exercise of peremptory challenges.[3] Prospective juror Paul Raymond had previously been arrested, fought with the officers during his arrest, and stated only that he hoped he could put aside this negative experience in evaluating police officer testimony. This juror also had a "close" cousin who had previously been convicted of multiple murders. *See United States v. Lampkins*, 47 F.3d 175 (7th Cir.1995) (fact that prospective juror had relatives convicted of a crime justified peremptory challenge despite allegation of purposeful discrimination). Indeed, although the trial judge

1. Jurors Mannyofe and Handelman were both peremptorily challenged in the second round, after which the court noted that one of the prosecution's two challenges was exercised against a black (V.738). While surnames are not always an accurate indicator of race, it seems likely that juror Handelman was not the black juror referred to.

2. Jurors Moore, Leach, and Annexi (who did not live in the areas) were the three prospective jurors peremptorily challenged by the

prosecution in the third round, during which the prosecution exercised two of its three challenges against blacks (V.1281). It is unclear from the record whether Moore and Leach (who did live in the area) were both black.

3. Subject to the qualifications noted in footnotes 1 & 2, notations in the record from the judge and parties indicate that the jurors discussed in this section were black.

denied the prosecutor's challenge for cause against Raymond, he noted that it would be a "peremptory challenge with good reason" (V.1497). Prospective juror Marion Johnson was inattentive during voir dire, as she entirely failed to respond to the court's question concerning which members of the panel had previously served as jurors, even though she later admitted that she had served before (V.603). *See United States v. Rudas*, 905 F.2d 38 (2d Cir.1990) (inattentiveness of juror justified challenge against member of cognizable group); *United States v. Sherrills*, 929 F.2d 393 (8th Cir.1991) (same). Similarly, prospective juror Annexi had difficulty understanding the court's questioning even though the court asked the same questions of almost all prospective jurors without any miscommunications (V.1180–82), and prospective juror Chesson did not seem to understand initially that the question of guilt or innocence was to be decided by the jury (V.1382). *See United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir. 1991) (juror's apparent inability to follow or understand questions directed to her during voir dire justified prosecutor's peremptory challenge). Prospective juror Leach volunteered that she would put herself in the place of petitioner when considering the case, making her a less than ideal prosecution witness (V.1281). Prospective juror Mannyofe did volunteer work, which, like certain occupations in social work or counseling, might make him "a more suitable target" for a peremptory challenge than those who did not volunteer. *See United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir.1991) (accepting prosecution's race-neutral reason for striking juror that her occupation as a social worker made her a less desirable juror). Prospective jurors Handelman and Blair were legal secretaries who may have claimed greater knowledge of the legal system than other members of the jury (V.691–92, 1436–37). *See United States v. Johnson*, 941 F.2d 1102 (10th Cir.1991) (prospective juror's occupation as legal secretary for housing attorney justified peremptory challenge despite allegation of racial motivation). And prospective juror Middlebrooks had a son who was nineteen years old, approximately the same age as petitioner when he committed this crime (V.1071–72). *See United States v. Byse*, 28 F.3d 1165 (11th Cir.1994) (fact that prospective juror had son of similar age to petitioner justified peremptory challenge against minority). All of these facts, which were clearly before the trial judge, counsel against any inference of discrimination based solely on the statistics petitioner offers.

In addition, at least two blacks, who were so identified by the prosecutor and judge, sat as jurors, and another two as alternates (V.1388–89, 1497, 2280). The defendant himself peremptorily challenged an additional three prospective black jurors who otherwise would have sat on the jury (V.670, 738, 1280), and challenged another for cause (V.1276). In addition, at several points during the voir dire, the prosecution had opportunities to challenge black venire members but declined to do so. The record reveals that during the first, second, third and fourth rounds, the prosecution declined to strike black jurors although it had several challenges available for this purpose (V.670, 738, 1280, 1486). Thus, if not for his own actions, petitioner could have seated a jury of twelve that was composed of at least five blacks (not counting the challenge for cause), a composition slightly greater than the actual representative population of Queens County. All of these facts counsel against any inference of discrimination based solely on the statistics petitioner offered in support of his *Batson* challenge at trial.

Finally, a thorough review of the entire three-week long voir dire reveals a complete lack of even one racially-charged comment or question by the prosecutors. *See Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712 (questions by prosecutors during voir dire may establish or contribute to *prima facie* case). Moreover, petitioner's counsel waited until nearly the entire three weeks of voir dire were concluded before raising a *Batson* claim, and did not ask for race neutral reasons until after the judge had already excused the challenged nine jurors from the first five panels. Even then, he relied solely on the number of challenges without any effort to place on the record other facts relevant to the issue of a *prima facie* case. Indeed, cases like these always raise concerns that defense counsel may simply have been trying to do the minimum necessary to preserve an issue for an appeal based on an error, if error it was, that did not have any affect on the verdict or deprive the defendant, as opposed to the challenged juror, of the right to the equal protection of the law. *See Allen v. Hardy*, 478 U.S. at 259, 106 S.Ct. 2878. This is another reason to hold petitioner strictly to his burden of articulating and developing the factual and legal grounds of his *Batson* challenge. *See Brown v. Kuhlmann*, 142 F.3d 529, 541–42 (2d Cir.1998).

On this record, it is not possible to conclude that the determinations of the trial judge and the Appellate Division were unreasonable or a misapplication of Supreme Court precedent. While another court considering the issue *de novo* might find a *prima facie Batson* violation based on the statistical disparity in petitioner's case, even if it erred, the state court did not go beyond the "increment of incorrectness" necessary to constitute an "objectively unreasonable" application of *Batson, Francis v. Stone*, 221 F.3d at 111, when it concluded, on the basis of a record undeveloped by petitioner, that the number of peremptory challenges without more was not "sufficient to raise an inference that the prosecutor had used his peremptory challenges to exclude individuals because of their race." *See Overton*, 295 F.3d at 279–80. My colleague Judge Sterling Johnson came to a similar conclusion with respect to petitioner's co-defendant, Todd Scott, whose habeas petition was based on the same selection process and jury venire at issue here. *See Scott v. Senkowski*, 2002 WL 31051592, *3 (E.D.N.Y. Aug.15, 2002).

## IV. THE TRIAL JUDGE'S FAILURE TO EXCUSE POTENTIAL JURORS FOR CAUSE

Relying on his co-defendant Todd Scott's Appellate Division brief, petitioner claims that the trial court should have excused for cause four prospective jurors, Katerina Vancek, Willimena Smith, Rose Saldinger, and Eileen O'Connor, due to their alleged partiality. Petitioner's claim is without merit because the issue was not preserved for appeal with respect to two of the jurors, and the remaining jurors did not sit on the jury that convicted petitioner.

### A. Independent and Adequate State Ground

 A federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 728, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ("It is a well-established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts."). If a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement,

these claims are consequently barred from federal habeas review. *See Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546; *Engle v. Isaac,* 456 U.S. 107, 124–25, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (a petitioner who failed to properly preserve a claim for state appellate review is procedurally barred from obtaining federal habeas review of the claim if the state appellate court invoked a state procedural bar as the basis for rejecting the claim).

■■■ Todd Scott, upon whose brief petitioner relies to support his claim, did not challenge either prospective juror Katerina Vancek or prospective juror Willimena Smith for cause during voir dire. There is ample evidence that the New York Appellate Division declined to review petitioner's contention as unpreserved under a state-law procedural bar on this ground. Although the Appellate Division did not expressly address petitioner's challenge-for-cause claim, (it dismissed all of petitioner's unreferenced claims as either unpreserved for appellate review or without merit), *People v. Copeland,* 197 A.D.2d 629, 602 N.Y.S.2d 683 (2d Dep't.1993), failure of the state court to make an express reference to the procedural bar will not foreclose a federal court's reliance on the procedural bar to reject the claim *See, e.g. Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Rather, the habeas court should determine whether there is "good reason to question whether there is an independent and adequate state ground" for the state's rejection of the claim. *Coleman,* 501 U.S. at 739, 111 S.Ct. 2546.

■■■ While the Appellate Division did not specifically address this argument in the context of petitioner's appeal, the same court ruled on co-defendant Scott's appeal and expressly held "[t]his issue is unpreserved for appellate review at least with respect to two of the prospective jurors whom the defendant now claims the court

erroneously failed to dismiss, since at the voir dire, the defendant's counsel failed to challenge them for cause." *People v. Scott,* 197 A.D.2d 644, 645, 602 N.Y.S.2d 681 (2d Dep't.1993). Relying on this decision, Judge Johnson rejected Scott's petition for a writ of habeas corpus because the "Appellate Division's judgment rests on an independent and adequate state procedural ground." *Scott v. Senkowski,* 2002 WL 31051592, *3 (E.D.N.Y. Aug.15, 2002). As petitioner relied entirely on co-defendant Scott's argument of this issue (his brief merely states that it adopts the issues raised by his co-defendants), it is reasonable to conclude that the Appellate Division's summary rejection of petitioner's claim was similarly based on this procedural bar. Indeed, the court in *Scott* referenced petitioner's similar appeal in the same paragraph it discussed the challenge-for-cause claim. *Scott,* 197 A.D.2d at 645, 602 N.Y.S.2d 681. Moreover, the state vigorously opposed Scott's appeal of the challenges-for-cause on the ground that the issue was unpreserved. This is a principal factor in a habeas court's evaluation of the basis for an appellate court's decision. *See, e.g., Gruttola v. Hammock,* 639 F.2d 922, 929 (2d Cir.1981) (citing *County Court of Ulster County v. Allen,* 442 U.S. 140, 147–54, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)). Thus, to the extent petitioner's claim is procedurally barred, he is precluded from receiving habeas review.

■■■ There is, however, one relevant distinction in petitioner's case that must be addressed. Unlike prospective juror Katherina Vancek who was never challenged for cause by any defense counsel (V.736–737), prospective juror Willimina Smith was challenged for cause by petitioner's attorney (V.1278–1279). The Appellate Division rejected co-defendant Scott's claim as unpreserved because the

defendants' challenges were exercised independently and Scott himself did not challenge Ms. Smith. *Scott,* 197 A.D.2d at 645, 602 N.Y.S.2d 681. Thus, I must consider whether petitioner's claim should also be barred by the Appellate Division's ruling because petitioner raised this issue only by adopting co-defendant Scott's procedurally deficient appellate brief.

▮ Petitioner did not raise this claim specifically or independently. He did not set forth the basis for this claim either before the Appellate Division or in his habeas petition; indeed, his briefs do not even identify this ground by name. Petitioner merely appended a catch-all phrase to the back page of his Appellate Division brief incorporating by reference every argument made by all of his co-defendants. This method of articulating a ground for appellate or habeas relief is unacceptable. For a claim to be exhausted the state court must be fairly apprised that petitioner is raising a federal constitutional claim, as well as the factual and legal premises underlying the claim. *See Morgan v. Jackson,* 869 F.2d 682, 684 (2d Cir.1989); *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). When an appellant fails to set forth his grounds for an appeal with any particularity, the court does not have " 'a duty to look for a needle in a paper haystack.' " *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (quoting *Mele v. Fitchburg Dist. Ct.,* 850 F.2d 817, 822 (1st Cir.1988)). The *Grey* Court recognized that a petitioner could not merely attach an appellate brief and expect the reviewing court to comb through the record looking for applicable grounds. *Grey,* 933 F.2d at 120; *see also, e.g., Perez v. Greiner,* 2000 WL 915114, *6 (S.D.N.Y. July 5, 2000) ("[petitioner's] mere enclosure of his Appellate Division briefs in his leave to appeal application, without requesting the Court of Appeals to review all claims, is not sufficient, and his claims therefore are unexhausted."). The notice here is even less adequate, because petitioner refers the court not to his own appellate brief, but to the briefs of his various co-defendants. *See Mele,* 850 F.2d at 822 (the reviewing court "cannot be presumed to have a duty to look for a needle in a paper haystack—let alone a haystack located in someone else's barn"). Petitioner could not possibly expect the appellate court to search through the briefs of several additional defendants and not only look for arguments that may apply to him, but also develop specific facts to demonstrate how one of these unarticulated claims is actually stronger for petitioner than the co-defendant who raised it. Under the circumstances, petitioner should be bound by the Appellate Division's rejection of co-defendant Scott's appeal and precluded from seeking habeas relief.

▮ A petitioner may evade preclusion of habeas review notwithstanding the existence of an adequate and independent state ground, if he can prove both cause for his procedural default and that he will be prejudiced by a lack of habeas review. *See Wainwright,* 433 U.S. at 90–91, 97 S.Ct. 2497. To establish "cause," petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *see also Amadeo v. Zant,* 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). To establish "prejudice" resulting from the court's failure to review the claim, petitioner must demonstrate a "substantial likelihood" that, but for the alleged constitutional error, petitioner would not have been convicted. *See United States v. Frady,* 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Petitioner has not alleged any cause for his procedural failure, nor can he establish that the outcome of the proceeding would have been differ-

ent absent the alleged constitutional violation.

### B. No Constitutional Violation

■■■■ To the extent that petitioner's claims regarding potential jurors Rose Saldinger and Eileen O'Connor were not procedurally barred in state court, these claims lack merit because none of the challenged jurors sat on the jury that convicted petitioner. (V.737, 1280). "Any claim that the jury was not impartial ... must focus not on [the suspect juror], but on the jurors who ultimately sat." *Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Petitioner's allegations are limited to potential jurors that were ultimately struck during voir dire. As a result, petitioner "has in no way established the partiality of the jury that ultimately convicted him," and may not successfully claim deprivation of his Sixth Amendment or due process rights. *United States v. Towne,* 870 F.2d 880, 885 (2d Cir.1989). Nor may petitioner rest his constitutional claims on the loss of peremptory challenges resulting from the trial judge's denial of his challenges for cause. The Supreme Court has "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross,* 487 U.S. at 88, 108 S.Ct. 2273. Indeed, because peremptory challenges are "not of constitutional dimension," the fact that petitioner had to use a peremptory challenge to achieve an impartial trial does not mean that the Sixth Amendment was violated. *Id.*

Moreover, the trial judge granted petitioner four more peremptory challenges than allowed by statute (V.1340, 2270), while afforded the prosecution no additional challenges. These additional peremptories were sufficient to exclude the allegedly biased jurors and still afford petitioner the statutorily prescribed number of challenges. Thus, petitioner's need to use peremptory challenges to excuse the four allegedly partial jurors did not even diminish the number of peremptories to which he was otherwise entitled under state law, much less result in any constitutional violation.

### V. THE PROSECUTOR'S PREJUDICIAL COMMENTS DURING OPENING AND CLOSING STATEMENTS

Petitioner's claim that the prosecutor's prejudicial comments in his opening and closing statements denied petitioner his right to a fair trial is without merit.

■■■■ To merit habeas relief, the prosecutor's comments must constitute "more than mere trial error, and [must] instead [be] so egregious as to violate the defendant's due process rights." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir. 1998). As the Supreme Court has stated, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned"—the relevant question is whether the prosecutor's comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Thus, petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir.1994) (internal citations omitted). In evaluating the effect of the comments, the Supreme Court has looked to whether the comments manipulated or misstated evidence, and whether they implicated other specific rights of the accused. *Darden,* 477 U.S. at 182, 106 S.Ct. 2464. Other considerations include whether the objectionable comments were

invited by the defense, whether the court issued appropriate admonitions or instructions to the jury, how heavily the evidence weighed against petitioner, and the opportunity of the defense to address or counter the prosecutor's allegedly improper comments. *Id.* at 182–83, 106 S.Ct. 2464; *United States v. Young,* 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Donnelly,* 416 U.S. at 645, 94 S.Ct. 1868.

■■■ The trial court's determination that the prosecutor's statements did not rise to the level requiring a new trial was not contrary to, or an unreasonable application of, clearly established federal law. The prosecutor's statement that the victim "was the recipient of a symbolic message by the agents of death," while perhaps more colorful than necessary, was a fair statement of the record. According to testimony adduced at trial, the execution-style murder of Officer Byrne was ordered from prison by the head of a drug organization known as the "Beebos," in order to send a message to the police. Moreover, this description pales in comparison to the types of comments the Supreme Court has deemed constitutional. In *Darden* for instance, the prosecutor remarked that the death sentence was "the only way that I know that [the defendant] is not going to get on the public," that the petitioner "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." 477 U.S. at 180 nn. 10, 11, 106 S.Ct. 2464. The prosecutor also stated, "I wish someone had walked in the back door and blown [the petitioner's] head off at that point." *Id.* at 180 n. 12, 106 S.Ct. 2464. Nevertheless, the Court ruled that the statements, though improper, did not deprive the petitioner of due process. *Id.* at 182–83, 106 S.Ct. 2464; *see also United States v. Simmons,* 923 F.2d 934 (2d Cir.1991) (comments concerning "collapsed veins of junkies" and "swollen arms" were "blunt and to the point" but did not warrant new trial).

■■■ The statement that petitioner and his co-defendant had the power to hire workers, the power to sell drugs, and a power of life or death over other human beings was also a fair statement of the record. Evidence demonstrated that petitioner wielded a significant degree of authority in a drug organization, had the power to sell drugs, and believed that he had the power to kill in furtherance of his organization's goals. In addition, the prosecutor's comment was invited by the statements of defense counsel, who disputed the existence of any drug organization and characterized petitioner as "an uneducated young man" who was simply a "pawn" in this case (T. 3683, 3684, 3710, 3740). In response, it was not unreasonable for the prosecution to argue its theory of the case—that the execution of Officer Byrne was carried out by high-ranking members of a drug organization. *See United States v. Smith,* 918 F.2d 1551 (11th Cir.1990) (prosecutor's comment that "this is a war on drugs. And [defendant] is symbolic of the enemy" was responsive to defense counsel's remark that the prosecutor had used "an atomic bomb approach").

■■■ The prosecutor's admonition to the jurors to "do your duty," was also not severe enough to require a new trial. *See Young,* 470 U.S. at 18, 105 S.Ct. 1038 (while it was error for the prosecutor to exhort the jury to "do its job," the error did not "influence the jury to stray from its responsibility to be fair and unbiased"). Taken in context, the statement was clearly not intended to prejudice the jury. Prior to his admonition, the prosecutor explained that the "duty" of the jury was to determine the facts and resolve conflicting evidence (T. 3776, 3814). The prosecutor also told the jury that its job was "to come together to determine what happened back on February 26, 1988." (T. 3776). In the context of these additional comments, the

prosecutor's remarks were not so out of place as to constitute the type of egregious error that could have "infected the trial with unfairness." *Darden,* 477 U.S. at 169, 106 S.Ct. 2464.

In any event, the brief and isolated nature of the prosecutor's comments within the extended trial diminished their capacity to have a "substantial and injurious effect or influence in determining the jury's verdict." *Bentley,* 41 F.3d at 824 (denying habeas relief where "prosecutor's summation comments were both brief and isolated"). The prosecutor's summation comments were few in number and made in the context of a lengthy and comprehensive analysis of the evidence. The vast majority of the hour-long summation was a detailed organization and analysis of the trial evidence, which, taken as a whole, properly focused the jury's attention on the evidence rather than on the few "colorful" phrases.

Furthermore, the trial court dissipated any adverse effects of the prosecutor's comments through curative actions and its instructions in the preliminary and final jury charges. The trial court promptly sustained all objections to challenged comments in the prosecutor's opening (T. 69, 81), and many objections during the summation. Other comments such as the statement that the victim "lived a short life" and had "taken an oath to serve" were stricken from the record, with admonitions to "[c]onfine [his] summation to discussion of the evidence." (T. 3817). The court also reminded the jury at several points during the trial that the statements of counsel were not evidence, that the jurors were the sole judges of the facts, and that they should not let sympathy or prejudice enter their deliberations (T. 32–34, 3679, 4005–07, 4066). *See Tankleff v. Senkowski,* 135 F.3d 235, 253 (2d Cir.1998); *United States v. Locascio,* 6 F.3d 924 (2d Cir. 1993) (prejudice from prosecutor's remark

that jurors would be less than human if they did not feel concern for their safety was mitigated by fact that trial court promptly struck the remark); *United States v. Torres,* 845 F.2d 1165 (2d Cir. 1988) (potential prejudice from prosecutor's statement in opening about the enforcement of the drug law was dissipated by court's instruction to "[j]ust tell us what you're going to prove").

Finally, in light of the overwhelming proof of petitioner's involvement in Officer Edward Byrne's death, the absence of the alleged prosecutorial misconduct would not have affected the certainty of petitioners conviction. This is not a case in which "the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury." *Tankleff,* 135 F.3d at 253. Thus, the state court acted reasonably in concluding that this was not one of the "rare" cases in which repeated errors were so egregious as to infect the entire trial and violate due process. *See Floyd v. Meachum,* 907 F.2d 347, 348 (2d Cir.1990).

## VI. JUDICIAL BIAS

Petitioner argues, by incorporating the appellate briefs of co-defendants, that he was denied a fair trial because the judge expressed a bias against the defense throughout the criminal proceedings. This claim must be denied because petitioner has not shown that the trial judge was biased or that his intervention was sufficiently prejudicial to justify habeas relief.

### A. Conduct of Defense Counsel Biased Trial Judge Against Petitioner

 Petitioner's first claim, as briefed by co-defendant McClary, is that the conduct of his co-defendants' (i.e. Todd Scott and Scott Cobb) attorneys during pretrial hearings prejudiced the court against petitioner. The Due Process

Clause of the Fourteenth Amendment requires " 'a fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). However, where the alleged bias is rooted not in any external catalyst but rather in the trial proceedings themselves, judicial bias is almost never a basis for habeas relief:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.,* at 28, 41 S.Ct. 230 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

The confrontations between the trial judge and defense counsel here were precipitated by the trial judge's frustration with counsel's inappropriate conduct, or general efforts by the judge to ensure that the hearing proceeded in an expeditious and orderly manner. There is nothing in the record that remotely approaches the level of partiality required for a constitutional remedy.

Moreover, petitioner's claim of bias is entirely speculative. His co-defendant McClary, upon whose brief petitioner relies, cites no incidences during the trial where the judge's conduct could be characterized as biased against petitioner. A mere allegation of judicial bias or prejudice unsupported by references to the record cannot in and of itself establish a federal constitutional violation. *See Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). In any event, a careful review of the more than 4,000 pages of transcript shows that the trial judge did not impermissibly favor the prosecution or exhibit animus towards the defense. Indeed, there were numerous instances throughout the trial where the judge ruled in favor of the defendants. For instance, the court sustained defense counsel's objection to improper direct testimony by the prosecutor (T. 217), sustained objections to challenged comments during the prosecutor's opening statement (T. 69, 81), and admonished the prosecutor for inappropriate comments during his summation (T. 3817, 3819). There is sim-

ply no evidence that co-counsel's behavior during the pretrial hearings prejudiced the trial judge against petitioner.

### B. The Trial Judge Made Disparaging Remarks to Defense Counsel in the Presence of the Jury

 Petitioner, through co-defendant Todd Scott, also alleges that he was denied a fair trial because the trial judge made disparaging comments to defense counsel in front of the jury. As with petitioner's other judicial bias claims, the evidence simply does not bear out his claim of prejudice, much less prejudice of such a degree as to have fundamentally impacted the fairness of the entire trial.

 While there is "no doubt that prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause," *Daye v. Attorney General of New York*, 712 F.2d 1566 (2d Cir.1983), trial judges are accorded significant leeway in performing their "duty as more than a moderator to clarify ambiguous questions and testimony for the jury and to insure that the trial [is] fairly conducted." *United States v. Pellegrino*, 470 F.2d 1205 (2d Cir.1972). Indeed, it is presumed that public officials have " 'properly discharged their official duties.' " *Gramley*, 520 U.S. at 909, 117 S.Ct. 1793 (quoting *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)). Moreover, the standard of review is even more limited where a federal court is asked to review the conduct of a state court judge:

> Because trial judge intervention will exceed federal standards of judicial propriety before transgressing the limits of fundamental fairness required by the Constitution, federal courts have had little opportunity to delineate the constitutional bounds of trial judge intervention. It is only in reviewing a habeas corpus

petition like Daye's that we must distinguish between the extent of trial court intervention that offends federal court standards and the more fundamentally unfair conduct that exceeds constitutional limits. The distinction reflects an important facet of federalism: federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts. The only commands that federal courts can enforce in state courts are those of the Constitution.

*Daye*, 712 F.2d at 1571. *See also Garcia v. Warden, Dannemora Correctional Facility*, 795 F.2d 5, 7 (2d Cir.1986) (a federal court's power to review a state claim of judicial bias is restricted to "the narrow one of due process and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court") (citations omitted). Thus, questions concerning a judge's partiality or intervention rarely rise to the level of a constitutional claim because the Due Process Clause "establishes a constitutional floor, not a uniform standard." *Gramley*, 520 U.S. at 904–05, 117 S.Ct. 1793; *see also Gayle v. Scully*, 779 F.2d 802, 813 (2d Cir.1985) ("a petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task").

 The critical question in determining whether the trial judge was fundamentally unfair is twofold: (1) did the trial judge's interference "distract the jury from a conscientious discharge of their responsibilities to find the facts, apply the law, and reach a fair verdict," and (2) "was the overall conduct of the trial such that public confidence in the impartial administration of justice was seriously at risk." *Daye*, 712 F.2d at 1572. While the standard is admittedly "ill-defined," *Johnson v.*

*Scully,* 727 F.2d 222, 226 (2d Cir.1984), it is clear that the trial judge may question witnesses, including the defendant, and that such questioning may be adverse and may emphasize evidence damaging to the defendant's case. *Daye,* 712 F.2d at 1572. Nor is the number of interventions by the trial judge determinative, although the extent of intervention "provides a context in which the risks of adverse questioning should be assessed." *Id.* Nevertheless, because the Second Circuit has not yet found a state judge's intervention to be unconstitutional, the sort of conduct that "transgress[es] the limits of fundamental fairness" remains unclear. Hopefully, it is something short of conduct that would "convey the picture of a judge who had 'enter[ed] the lists[, or] by his ardor induce[d] the jury to join in a hue and cry against the accused.'" *Id.* at 1572 (quoting *United States v. Marzano,* 149 F.2d 923, 926 (2d Cir.1945)). Whatever that threshold may be, however, it was clearly not breached by the trial judge's conduct in this case.

The allegedly prejudicial comments made by the trial judge include his statement that "[in m]y next trial, I hope I don't get comedians for lawyers," in response to Mr. Alosco's attempt to make a joke during the cross-examination of prosecution witness Darby Newby (T. 494–95). During the direct examination of Martin Howell, the judge sustained an objection by petitioner's attorney, Mr. Hancock, after which Mr. Hancock stated: "Thank you. It's rare." The judge's response was "Come on, Mr. Hancock, please let's cut out the comedy here . . . There was comedy, come on now . . ." (T. 543). Both of these exchanges illustrate that the judge was properly attempting to quell inappropriate conduct by defense counsel and focus the jury upon the matter at hand and away from the antics of defense counsel.

In addition, counsel for each of the defendants continually made comments after voicing objections and after the court had made its rulings, despite the judge's request that they refrain from doing so. Thus, at one point after Mr. Fishman, Scott Cobb's attorney, objected to a question during the direct examination of Darby Newby, the judge stated "Please Mr. Fishman, no more comments. What is it? One Thousand and Three times? No more." (T. 373). This exchange was met with another inappropriate comment by counsel to which the court wisely did not respond (Id.). Once again, the trial judge's expression of frustration at defense counsel's continued unsuitable behavior in making unsolicited comments after rulings on objections was a proper and measured response, calculated to prevent the trial from degenerating into a circus.

Finally, during cross-examination of Darby Newby, Mr. Fishman asked the court repeatedly to take judicial notice of what "Youthful Offender Treatment" meant because Newby had apparently been promised such treatment in exchange for his testimony. After ascertaining that Newby was never told of the meaning of "Youthful Offender Treatment," the judge refused to instruct the jury as to its meaning (T. 429). The court's ruling was met with multiple additional objections by counsel, to which the judge responded: "For the third time, I will not." (T. 430). After Mr. Fishman remarked that "[t]he Court will not take judicial notice of the Laws of the State of New York," the judge stated: "Oh, My God. Step around here please." (T. 430). The judge then responded to counsel's misconduct outside the jury's presence (Id.).

Taken in context, the trial judge's comments did not fundamentally affect the fairness of petitioner's trial. Indeed, only one exchange even involved petitioner's

own attorney. Moreover, the trial court explicitly charged the jury that it should not consider anything that the court said during trial as indicative of the fact that he held any opinions with respect to the case (T. 4006), and that they were not, under any circumstances, to draw inferences from anything said between and amongst the attorneys and the court (T. 32). In any event, all of the judge's responses were proper attempts to focus the jury's attention on the facts of the case and prevent distractions by defense counsels' inappropriate conduct. They do not rise to the heightened threshold of a due process violation, as illustrated by three Second Circuit decisions in this area.

In *Johnson v. Scully*, 727 F.2d 222 (2d Cir.1984), the trial judge questioned the codefendant in a way that suggested the judge's disbelief in the essence of the defense, *id.* at 227, took such an unusually active role in the case that he asked more questions than both the prosecutor and defense attorney, and frequently interrupted and rebuked defense counsel, even taking over the direct examination of defendant's witnesses. *Id.* at 225–26. Although the court found the judge's conduct "troublesome," and noted that he had "strayed a considerable distance from the model of a neutral magistrate," it nonetheless ruled that the conduct did not rise to the level of a federal constitutional violation. *Id.* at 227. The trial judge's actions in this case are far less egregious than the conduct deemed constitutional in *Johnson.*

In *Daye v. Attorney General of New York,* the trial judge explicitly challenged the defendant's story, asked the defendant to get off the stand and demonstrate how his account could possibly be true, and constantly referred to the defendant as the robber. *Daye,* 712 F.2d at 1569. Nevertheless, the Second Circuit found that no constitutional violation had occurred. *Id.* A similar finding was made in *Gayle v.*

*Scully.* The trial judge there vigorously questioned the defendant about his alibi, asking for minute details about his trip to Coney Island and sarcastically asking whether the defendant went swimming when the events took place in January. *Gayle,* 779 F.2d at 810–11. The judge also interjected a question as to whether members of defendant's Rastafarian religion were assassins and "animals," a reference that was picked up by the prosecution in its summation. *Id.* at 811. However, despite also providing extensive examples from the trial transcript of "[t]he judge's disparate treatment of defense and prosecution counsel," "[t]he judge leap[ing] to the aid of the prosecution witnesses time and again," and "[t]he judge talk[ing] down to the defense [counsel]," *id.* at 820, the Second Circuit held that the conduct was not "substantially different" from the conduct of trial judges in previous cases and, accordingly, that "the petitioner was not denied a fundamentally fair trial." *Id.* at 812. The alleged misconduct in this case pales in comparison to the types of improper behavior found to be constitutional in *Gayle, Daye* and *Johnson.* As long as these cases remain the guideposts in this area, they compel the conclusion that the trial judge's conduct here did not render the trial so fundamentally unfair as to warrant relief pursuant to 28 U.S.C. § 2255.

### C. The Trial Judge's Unbalanced Marshaling of the Evidence in His Charge to the Jury

 Relying on the Appellate Division brief of co-defendant Scott, petitioner also claims that the trial judge improperly marshaled the evidence in an unbalanced manner during his charge to the jury. But the propriety of a state trial court's jury instructions is ordinarily a matter of state law that does not raise a federal constitutional question. *See Cupp v.*

*Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States ex rel. Smith v. Montanye,* 505 F.2d 1355, 1359 (2d Cir.1974); *Grey v. Henderson,* 788 F.Supp. 683, 693 (E.D.N.Y.1991). To obtain habeas corpus relief, a petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp,* 414 U.S. at 146, 94 S.Ct. 396. Moreover, the challenged instruction cannot be viewed in isolation, but must be viewed in the context of the overall charge and as merely one element alongside all of the testimony, evidence, and arguments by counsel. "The question is whether the 'ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Grey v. Henderson,* 788 F.Supp. at 693 (quoting *Cupp,* 414 U.S. at 147, 94 S.Ct. 396).

 Essentially, petitioner's argument is that the trial judge's marshaling of the evidence to the jury was biased—it unduly emphasized evidence supporting the prosecution's case while diminishing or ignoring evidence supporting petitioner's defense. When faced with such a claim, a federal habeas court "must find the trial court's conduct to be substantially significant and substantially adverse to the defendant before it holds that the trial judge's conduct created an appearance of partiality which exceeded constitutional limitations." *Jenkins v. Bara,* 663 F.Supp. 891, 898–99 (E.D.N.Y.1987) (citing *Johnson,* 727 F.2d at 226; *Daye,* 712 F.2d at 1570–71). In *Johnson,* for instance, the Second Circuit agreed with the district court that the manner in which the state trial judge marshaled the evidence demonstrated his clear bias in favor of the prosecution's case. The judge recounted the prosecutor's theory of the case at length, set forth the defendant's contentions only briefly (often accompanied by the answering contentions

of the prosecution), and made several pointed adverse remarks that clearly expressed the judge's disbelief of the defendant's case. *Johnson,* 727 F.2d at 226. The court nonetheless reversed the district court's decision to grant the writ, concluding that the trial judge was not required to provide "equal time" to the defendant's case when marshaling the evidence presented, particularly where the majority of the testimony was presented by the prosecution, and that the trial judge's conduct did not exceed the bounds of constitutionality. *Id.* at 227.

The trial judge's instruction in this case, taken as a whole, was not biased or prejudicial. The judge did not spend an inordinate amount of time marshaling the evidence in support of the prosecution, nor did his recitation of the evidence insinuate any antagonism towards the petitioner or his co-defendants. Indeed, the charge was replete with specific instructions benefitting petitioner and his co-defendants. For example, the interested witness charge expressly referred to a plea agreement between prosecution witness Darryl Newby and the District Attorney's Office (T. 4014–15). The trial judge also referred to testimony from the prosecution witnesses concerning money that was paid to them by the District Attorney's Office (T. 4014). The charge also warned the jury not to give police officers any more credibility than other witnesses (T. 4016). When instructing the jury on expert testimony provided by the prosecution's witnesses, the judge warned that such testimony was not binding and that it could be disregarded either in whole or in part (T. 4018–19). The trial judge also alluded to inconsistencies in the testimony of certain prosecution witnesses when it instructed the jury on impeachment and inconsistent statements (T. 4021–23). Finally, the trial judge's evenhanded delivery of the charge was again demonstrated when the charge referred to

the prior convictions of prosecution witnesses Martin Howell, Darby Newby and Rachel Moore (T. 4019–20). In sum, nothing in the trial court's marshaling of the evidence in any way rises to the level of prejudice required by the case law. *See, e.g., Cupp,* 414 U.S. at 147, 94 S.Ct. 396; *Johnson,* 727 F.2d at 226; *Daye,* 712 F.2d at 1570–71.

## VII. THE TRIAL COURT'S DENIAL OF PETITIONER'S REQUEST TO ABSENT HIMSELF FROM PORTIONS OF THE TRIAL

■ Petitioner's claim that the trial judge improperly denied his request to absent himself from portions of the trial pertaining solely to his co-defendants has no basis in the law. After petitioner had rested his case, he asked the trial judge to permit him to absent himself from the remainder of the trial, which included the defense of co-defendant Todd Scott (T. 3083). The trial court denied petitioner's request, holding that petitioner did not have a right to absent himself (T. 3087–88). The Appellate Division upheld the trial court's ruling. *People v. Copeland,* 197 A.D.2d 629, 602 N.Y.S.2d 683 (2d Dep't. 1993). Because this decision was not contrary to or an unreasonable application of Supreme Court precedent, petitioner's claim must be rejected.

While the Supreme Court has recognized that in certain exceptional situations, a criminal defendant may waive the right to be present during his criminal trial, *see, e.g. Diaz v. United States,* 223 U.S. 442, 457, 32 S.Ct. 250, 56 L.Ed. 500 (1912), it has never recognized a right of absence. The circuit courts that have addressed this issue have also declined to identify a constitutional right for a defendant to absent himself from his criminal trial. In *United States v. Moore,* 466 F.2d 547 (3d Cir. 1972), the Third Circuit specifically addressed the claim that Fed. R.Crim. Pro. 43 enabled a defendant in a felony case to

expressly waive his presence at trial. The court found that Rule 43 was "simply a codification of the existing law that a felony defendant shall be present at every stage of the trial." *Id.* at 548 (citing *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), *Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912)). Accordingly, the court held that

> [w]hile Rule 43 does permit the court to continue the trial when the defendant absents himself, it does not, concomitantly, vest a *right of absence* in a defendant. Moreover, there is no perceptible due process violation by demanding that the defendant attend trial, even where such identification is an integral part of the issues before the jury.

*Moore,* 466 F.2d at 548 (emphasis in original). *See also Swingle v. United States,* 151 F.2d 512, 513 (10th Cir.1945) ("A defendant, lawfully charged, may be compelled to present himself for trial"); *United States v. Fitzpatrick,* 437 F.2d 19, 27 (2nd Cir.1970) (defendant's contention that it was reversible error for the district court to deny his motion to waive his presence in the courtroom "finds no support either in Rule 43 or in the case law. Rule 43 permits a felony defendant whose trial has begun in his presence to be tried even though the defendant absconds. It does not give a defendant a right to absent himself from the courtroom, especially when his identification is the focal point of his trial.").

While declining to go as far as the Third Circuit, the Second Circuit has stated that "[n]ormally a judge can and should compel a defendant to be present at all stages of a felony trial pursuant to Rule 43(a)." *United States v. Cannatella,* 597 F.2d 27 (2d Cir.1979). The court recognized that "exceptional circumstances" might permit trial courts some discretion in permitting a

defendant to voluntarily opt out of appearing at trial, but agreed that generally "there is a duty on the part of a defendant in a felony trial to be present." *Id.* at 28. The exceptional circumstance contemplated by the court was an extreme risk of physical endangerment to the defendant, who was suffering from heart disease. Despite this potentially fatal health risk, however, the Second Circuit did not expressly find that the defendant was entitled to waive his right to be present; rather, it remanded to the district court for a determination of whether the circumstances were sufficient to permit the defendant, on the ground of illness, to waive his constitutional right to be present. *Id.* In contrast, petitioner's justification here for absenting himself—potential spill-over prejudice from being tried alongside his co-defendants—is hardly an "exceptional" or even unusual circumstance. Moreover, the narrow waiver contemplated by the Second Circuit in *Cannatella* encompassed a defendant's complete absence from trial, not a selective waiver whereby the defendant could appear and disappear at will, whenever he decided he might garner some tactical advantage by doing so.

In sum, petitioner has not demonstrated that the Appellate Division's decision to uphold the trial court's denial of petitioner's request to absent himself from the courtroom for selected parts of the trial was contrary to or involved an unreasonable application of Supreme Court precedent. No federal court has permitted a defendant to selectively waive his appearance on the basis asserted by petitioner. Indeed, the Supreme Court has explicitly permitted trial courts to compel a defendant's presence in the courtroom. Thus, petitioner's claim cannot be granted without recognizing a new constitutional rule—an action expressly prohibited by the Supreme Court. *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

## VIII. THE TRIAL COURT'S EXCLUSION OF PETITIONER'S EXPERT TESTIMONY

 Petitioner's challenge to the trial court's exclusion of testimony by a defense expert witness as to the effects of crack and cocaine addiction on a witness' ability to recall must be denied because the trial court's decision, even if erroneous, did not rise to the level of a federal constitutional violation.

 Federal courts are not empowered to correct every erroneous evidentiary ruling by a state court; rather, habeas relief may be granted only for those errors that are of such magnitude as to render the trial fundamentally unfair. *See Rosario v. Kuhlman,* 839 F.2d 918, 924–25 (2d Cir.1988) ("The court's duty on a petition for *habeas corpus* is to determine whether the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness."); *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983) ("writ would issue *only* where petitioner can show that the [evidentiary] error deprived her of a *fundamentally fair* trial")(emphasis in original). Thus, erroneous evidentiary rulings rarely rise to the level of a federal constitutional violation. *See Agard v. Portuondo,* 117 F.3d 696, 704–05 (2d Cir.1997), *rev'd on other grounds,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). Indeed, in order to prevail, petitioner must show that "'the omitted evidence creates reasonable doubt that did not otherwise exist.'" *Id.* at 705 (quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

 Petitioner has failed to demonstrate an error of constitutional dimension for two reasons. First, it appears that the trial judge's exclusion of the "expert" testimony was not erroneous. New York law permits the introduction of expert scienti-

fic testimony only if it is based on "professional reliable" sources. *People v. Wesley*, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994). Reliability of a specific scientific procedure depends on whether it is "generally accepted as reliable." *People v. Middleton*, 54 N.Y.2d 42, 49, 444 N.Y.S.2d 581, 429 N.E.2d 100 (1981). The proffered witness sought to testify on the effects of long-term crack use on a witness' ability to recall, based on "her clinical studies" (T. 1829). However, petitioner did not demonstrate or even argue that the studies performed by this witness were generally accepted or otherwise reliable.

In addition, even an erroneous decision on this issue would be rendered harmless by the fact that petitioner had an ample opportunity to argue the issue before the jury. In *Agard*, the Second Circuit held that the trial court's exclusion of expert testimony was "saved ... from rising to the level of constitutional harm because it did not deprive [the defendant] of the opportunity to make an argument to the jury." *Agard*, 117 F.3d at 706–07 (citing *Agurs*, 427 U.S. at 114, 96 S.Ct. 2392). Similarly, in *Agurs*, the Supreme Court found that the jury's ignorance of the victim's criminal record was not material to the defendant's self-defense claim, in part because evidence was already on record of the victim's propensity for violence, and thus the evidence was "largely cumulative." *Agurs*, 427 U.S. at 114, 96 S.Ct. 2392. In this case, petitioner and his codefendants extensively cross-examined Ms. Moore on her admitted drug use, firmly placing the issue before the jury. *See Henry v. Speckard*, 22 F.3d 1209, 1215–16 (2d Cir.1994) (finding erroneous exclusion of testimony harmless where "the jury had an adequate basis to assess [a key witness'] credibility" because of extensive cross-examination). Indeed, based on the evidence elicited from cross-examination, counsel for both petitioner and his codefendant vigorously argued in summation

that Moore was not a reliable witness because of her crack use. (T. 3700, 3752, 3757–58). The extensive evidence in the record of Ms. Moore's drug use, and petitioner's substantial use of that evidence to discredit her, would render any erroneous exclusion of expert testimony on the effects of crack use a harmless error and incapable of habeas relief.

## IX. ALL OF PETITIONER'S CLAIMS ARE PROCEDURALLY FORFEITED

Federal courts may not grant a writ of habeas corpus to a state petitioner unless "the applicant has exhausted the remedies available in the courts of the State, or ... there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of prisoners." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994) (citing 28 U.S.C. § 2254(b) (1988)). Under the exhaustion doctrine, a federal court may not review the merits of a petition for a writ of habeas corpus unless the petitioner has exhausted his available state court remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The exhaustion doctrine was designed to give state courts the initial opportunity to review and correct constitutional violations. *See Id.* at 275, 92 S.Ct. 509; *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir.1985). "[O]nce a claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard*, 404 U.S. at 275, 92 S.Ct. 509; *see also Daye*, 696 F.2d at 191 (to satisfy the exhaustion requirement, a habeas petitioner must afford the state courts "a fair opportunity to pass upon [the] federal claim"). A claim is deemed to be exhausted when "the substance of [a defendant's] federal claims" has been presented " 'to the highest court of the pertinent state.' " *Bossett*, 41 F.3d

at 828, *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995) (quoting *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990)). However, where the petitioner no longer has "remedies available" in the state courts, the claims are deemed exhausted. *Id.* at 828 (citations omitted).

■■■ For exhaustion purposes, a petitioner is not required to return to state court if it is clear that the state court would hold the claim procedurally barred. *See Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (citations omitted). Where a claim is procedurally barred, a petitioner no longer has state court remedies available within the meaning of 28 U.S.C. § 2254(b). *Id.* Under such circumstances, a federal court will reach the merits of the claim and grant relief only if the petitioner can establish that (1) failure to consider the federal claim will result in a fundamental miscarriage of justice such as the conviction of an actually innocent person, or (2) there exists good cause for the procedural default and prejudice resulting therefrom. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). A petitioner may demonstrate cause by "showing that the factual or legal basis for a claim was not reasonably available to counsel, ... [or that] 'some interference by state officials' made compliance impracticable ... [or that] the procedural default is the result of ineffective assistance of counsel." *Id.* (citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

■■■ Under New York Rules of Court § 500.10(a) an application for leave to appeal to the New York Court of Appeals may be made in letter form accompanied by the briefs filed below. The application "should identify the issues on which the application is based" with "particular written attention" to "identifying problems of reviewability and preservation of error." *Id.* Here, petitioner failed to raise any of

his claims for relief in his leave letter to the New York Court of Appeals. In his letter, petitioner merely requested permission for leave to appeal from the Appellate Division's order and stated "[t]o facilitate review on appeal, the litigants' briefs and the court's order are enclosed herein." (*See* October 25, 1993 letter). Because petitioner's leave application is completely silent as to which grounds he sought to appeal, petitioner did not exhaust any federal constitutional claims regarding his allegations.

■■■ The Second Circuit has concluded on at least one occasion that a letter attaching briefs and asking for review of "all issues outlined in defendant-appellant's brief and *pro se* supplemental brief" sufficed to seek review of all such issues. *Morgan v. Bennett,* 204 F.3d 360, 370–71 (2d Cir.2000). However, "[a] petitioner is not deemed to have presented a claim to the New York State Court of Appeals simply by attaching an Appellate Division brief without further elaboration of the claim in the petition for leave to appeal." *Mendez v. Artuz,* 2000 WL 722613, *25 (S.D.N.Y. June 6, 2000). Rather, the petitioner must designate which claims he is pursuing or, at the very least, clearly state that he is requesting review on all of the issues presented in the Appellate Division brief. For instance, in *Jordan v. Lefevre,* 206 F.3d 196, 198–199 (2d Cir.2000), the Second Circuit found that the petitioner's application for leave to appeal did not fairly appraise the Court of Appeals of his federal constitutional claims because his letter discussed only one claim at length and made merely passing mention of any additional claims:

> Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining

claims. *See Grey,* 933 F.2d at 120. We conclude, as did the district court, that arguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction. Petitioner's counsel has the obligation to set out these arguments. Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave. Had appellant more clearly stated that he was pressing all of the claims raised in the attached brief, or had his letter made no argument in detail but rather only " 'request[ed that the Court of Appeals] consider and review all issues outlined in defendant-appellant's brief,' " the result here would be different and the remaining claims would have been fairly presented to the Court of Appeals. *Morgan v. Bennett,* 204 F.3d 360, 370–71 (2d Cir.2000).

*Jordan,* 206 F.3d at 198–99.

Where, as here, the petitioner does not expressly request review of all the issues outlined in his appellate brief, and, in fact, does not identify a single issue to the exclusion of the others, but merely states in his application that he is enclosing his Appellate Division briefs and does not mention any of the claims, petitioner does not meet the exhaustion requirement. As the Second Circuit recently held: "We perceive the line drawn between *Morgan* and *Jordan* to be as follows. References to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal." *Ramirez v. Attorney General of State of New York,* 280 F.3d 87, 97 (2d Cir.2001); *see also Richardson v.*

*Greiner,* 2003 WL 76994, *2 (S.D.N.Y. Jan.7, 2003) (petitioner did not meet exhaustion requirement because he did not clearly inform the Court of Appeals that he was asserting issues in his attached briefs as bases for appeal, but merely attached the briefs and made no mention of any claims).

This case differs sharply from *Meatley v. Artuz,* 886 F.Supp. 1009, 1013 (E.D.N.Y. 1995), a case often cited for the proposition that claims may be properly raised before the Court of Appeals merely by attaching the Appellate Division briefs. In *Meatley,* Judge Nickerson noted that even a cursory glance at the petitioner's Appellate Division brief would have clearly notified the Court of Appeals which issues were being raised on appeal because there were only three bold print headings identifying the issues. *Id.* at 1014. In contrast, petitioner here attached "the litigants' briefs", which presumably included not only his own brief, but the Appellate Division briefs of three separate codefendants, and several *pro se* supplemental briefs, each of which asserted multiple claims that may or may not have been relevant to petitioner. There was simply no way for the Court of Appeals to identify which issues were raised by petitioner without pouring through all of the briefs and sifting out which claims may be factually relevant to petitioner—an exercise which would also entail a careful review of the nearly 5,000 page transcript of the trial and pretrial hearings. Moreover, recent cases have rejected the holding of *Meatley* in light of subsequent Second Circuit rulings. *See Perez v. Greiner,* 2000 WL 915114, *6 (S.D.N.Y. July 5, 2000) ("*Meatley,* however, is no longer good law after the Second Circuit's *Jordan* and *Morgan* decisions, where the leave application refers to the Appellate Division briefs but does not explicitly request the Court of Appeals to review the issues in the briefs"); *Mendez*

**144**

*v. Artuz,* 2000 WL 722613, \*25 n. 18 (S.D.N.Y. June 6, 2000).

Because petitioner purported to attach more than half a dozen briefs, many of which contained arguments completely inapplicable to petitioner, his sparse letter was clearly insufficient to alert the Court of Appeals as to which issues were being appealed with respect to petitioner's case. Without expressly identifying which issues he was raising from among the multiple briefs (or even identifying whose briefs he was attaching), petitioner effectively "transfer[red] to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave." *Jordan,* 206 F.3d at 198–99; *see also Black v. McGinnis,* 2001 WL 209916, \*3 (S.D.N.Y. Mar.1, 2001) ("Where the attached appellate brief contains multiple claims, a petitioner's failure to identify any issues in his application for leave 'transfers to the state court the duty to comb through an applicant's appellate brief to seek and find arguments. . . . [Therefore, by] failing to identify any issues in his request for leave to appeal, petitioner failed to 'fairly present the substance of a federal constitutional claim to the state court.'") (internal citations omitted). Consequently, petitioner did not exhaust his federal constitutional claims in state court.

Petitioner, however, cannot return to the New York Court of Appeals to exhaust his claims, because he already made the one request for leave to appeal to which he is entitled, and that request was denied. *See* N.Y.Ct. Rules § 500.10(a) (McKinney 2000); *see also Bossett,* 41 F.3d at 829; *Grey,* 933 F.2d at 120. If an unexhausted claim can no longer be raised in the state court, the habeas court may find the claim exhausted, but the claim is procedurally barred from review. *See Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris*

*v. Reed,* 489 U.S. at 263 n. 9, 109 S.Ct. 1038. Thus, absent a showing of cause for the procedural default and prejudice resulting therefrom, neither of which has been met here, I would be precluded from granting petitioner's claims even if they were meritorious.

## CONCLUSION

The petition for a writ of habeas corpus is denied. I also deny a certificate of appealability.

**SO ORDERED.**